IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 10, 2024 Session

**VICTORIA C. JENSEN v. TYLER C. JENSEN**

**Appeal from the Chancery Court for Hamilton County**
**No. 21-0223       Pamela A. Fleenor,  Chancellor**

_____

**No. E2023-00315-COA-R3-CV**

_____

In this divorce action, the husband appeals the trial court's (1) distribution of the marital estate; (2) award to the wife of modifiable transitional alimony; and (3) two awards to the wife of alimony *in solido*, one for half of what the court found to be assets dissipated by the husband and one for attorney's fees incurred in prosecuting the divorce.  The husband also appeals the trial court's adoption of the wife's proposed permanent parenting plan and a requirement that the husband attend in-person reunification therapy with the parties' children in their home city of Chattanooga.  Upon careful review, we determine that the trial court erred in failing to set a determinate time period for transitional alimony, and we accordingly modify the transitional alimony award to a five-year period. We affirm the trial court's judgment in all other respects.  Exercising our discretion, we deny the wife's request for an award of attorney's fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

Lisa Bowman, Chattanooga, Tennessee, for the appellant, Tyler C. Jensen.

John P. Konvalinka and Lawson Konvalinka, Chattanooga, Tennessee, for the appellee, Victoria C. Jensen.

**OPINION**

I.  Factual and Procedural Background

The plaintiff, Victoria C. Jensen ("Wife"), and the defendant, Tyler C. Jensen ("Husband"), were married in February 2011 in California and had two children born of

the marriage: a son born in July 2011 and a daughter born in October 2013 (collectively, "the Children"). The parties subsequently relocated from California to Chattanooga, Tennessee, where they purchased improved real property located on Glenview Avenue in the Lookout Mountain area ("the Marital Residence"). The parties separated on or about March 6, 2021. According to the final divorce decree, at the time of the separation, both parties were employed and were able to work remotely, Husband in online advertising and Wife in digital marketing. It is undisputed that after the separation, Husband resided primarily in Texas with his paramour, S.S., and her minor son. Husband testified at trial that he had leased a townhome in Chattanooga for one year beginning in May or June of 2021, but he acknowledged that he had only stayed in the townhome for "[m]aybe a month total."

On April 1, 2021, Wife filed a complaint for divorce in the Hamilton County Chancery Court ("trial court"), alleging irreconcilable differences or, in the alternative, adultery and inappropriate marital conduct. *See* Tenn. Code Ann. § 36-4-101 (11), (14) (West July 1, 2007, to current). She requested awards of temporary and permanent spousal support and asked that the trial court set Husband's child support obligation pursuant to the Tennessee Child Support Guidelines. Wife also requested an award of reasonable attorney's fees and expenses. Wife concomitantly filed a proposed permanent parenting plan wherein she would be designated the primary residential parent with all major decision-making authority for the Children. Under this plan, Wife requested that Husband be responsible for child support and for the Children's health insurance.

On April 30, 2021, Wife filed a motion to enforce the automatic statutory injunctions provided in Tennessee Code Annotated § 36-4-106(d)(1) and a motion for temporary child support. In support of both motions, Wife contemporaneously filed a declaration stating that on April 28, 2021, she learned that Husband had failed to make his routine monthly payment for a country club membership and that he had removed his bank account from the automatic payment for the membership.

Husband filed an answer and counter-complaint on May 13, 2021, admitting that irreconcilable differences existed between the parties while denying that he was guilty of inappropriate marital conduct. In his counter-complaint, Husband alleged irreconcilable differences or, in the alternative, Wife's inappropriate marital conduct as a ground for divorce. In response to Wife's request for spousal support, Husband denied that Wife needed or that he had the ability to pay alimony. He also requested an award of reasonable attorney's fees and court costs. Husband attached a proposed temporary parenting plan wherein he requested designation as the primary residential parent with 183 days of annual co-parenting time and joint decision-making authority for the parties. He also requested that the trial court set a child support obligation for Wife pursuant to

the Child Support Guidelines. Under Husband's plan, Wife was to be responsible for maintaining the Children's health insurance.

Wife filed a reply to Husband's counter-complaint on May 17, 2021, denying that she was guilty of inappropriate marital conduct. On June 24, 2021, Husband filed a motion to allocate the parties' expenses, requesting that Wife pay some of the parties' expenses prior to trial because Husband was paying a "disproportionately high amount of the parties' expenses" and "simply [could] not afford all the marital expenses as is."

On July 30, 2021, the trial court entered an agreed order regarding Wife's motions for temporary child support and to enforce the statutory injunction. The trial court ordered the parties to participate in mediation and "continue to make all normal payments for regular monthly bills" in a timely fashion. The court directed Husband to begin making monthly temporary child support payments in the amount of $1,486.00.

On August 17, 2021, Wife filed a motion to hold Husband in civil contempt, alleging that Husband had willfully violated the agreed order by failing to make regular monthly payments on the parties' mortgage, Wife's vehicle loan, and "charges associated with the parties' memberships at certain country clubs including, but not limited to The Lookout Mountain Club, the parties' streaming services, the parties' food delivery account, and [Wife's] gym membership." Wife also alleged that Husband had harassed and threatened her, averring that on March 6, 2021, Husband had been arrested and charged with domestic assault in connection with an incident involving Wife at the Marital Residence, which the parties' son witnessed.

Attached to Wife's contempt motion was an order entered by the Hamilton County General Sessions Court ("general sessions court"), granting Husband's bail upon issuance of an order of protection prohibiting him from contacting or coming around Wife. Wife also averred that Husband and S.S. had contacted Chattanooga police on July 29, 2021, and had accused Wife of harassment, resulting in Wife's arrest on August 11, 2021, at the Marital Residence in front of the Children. Wife was subsequently released the same evening, and she maintained that the harassment accusation had been without cause.

Husband filed a response on August 31, 2021, opposing Wife's contempt motion on the grounds that (1) all allegedly unpaid bills had been paid, (2) Wife was estopped from claiming purported violations of the no-contact order because the general sessions court had determined that Husband had not been in violation of the order, (3) Wife had harassed Husband by making death threats aimed at S.S., and (4) the trial court lacked subject matter jurisdiction to enforce criminal court bond conditions. Husband claimed that Wife's arrest had been due, *inter alia*, to her alleged actions of blocking Husband's vehicle from leaving on July 29, 2021, and making death threats against S.S.

On September 23, 2021, Husband filed a motion for appraisal of the Marital Residence, requesting that the trial court order an appraisal by an independent professional to be funded by Wife because the parties disagreed as to the valuation. Husband concomitantly filed a motion to adopt his previously filed proposed temporary parenting plan as in the best interest of the Children during the pendency of the divorce. Husband subsequently filed a motion on November 23, 2021, requesting holiday co-parenting time and adoption of his proposed temporary parenting plan.

Following a hearing, the trial court entered an order on January 10, 2022, concerning the pending motions. The court found that Husband was in civil contempt as to his temporary child support obligation but was not in contempt regarding his obligation to pay monthly household bills. Finding that the July 2021 order had been ambiguous regarding the parties' respective responsibilities to pay household expenses, the court clarified that Husband would be responsible for expenses historically paid by him, including, but not limited to, mortgage payments, car loan payments, and the Lookout Mountain Club membership payment. The court adopted an announced agreement of the parties that Husband would enjoy holiday parenting time from December 25, 2021, at 4:00 p.m. to December 29, 2021, at 4:00 p.m., subject to conditions that he exercise the parenting time in Hamilton County, be supervised by an individual identified in the order, refrain from driving with the Children, and refrain from alcohol consumption. The court awarded to Wife reasonable attorney's fees with respect to her contempt motion. Wife's counsel subsequently filed an affidavit of reasonable attorney's fees and expenses related to the contempt motion, requesting an award of $7,958.50.

Wife filed a second motion for civil contempt and enforcement of the statutory injunctions on January 20, 2022, alleging that Husband had willfully violated both the July 30, 2021 and January 10, 2022 orders. Wife specifically claimed that Husband had failed to pay the mortgage, the vehicle loan payment, the Lookout Mountain Club membership fees, and late fees incurred on the mortgage and vehicle loan. Wife also alleged that Husband had removed his credit card from the parties' streaming service, the parties' food delivery account, and Wife's gym membership. Wife requested that the trial court hold Husband in civil contempt or, alternatively, order Husband to comply with Tennessee Code Annotated § 36-4-106 with respect to the payment of the parties' regular bills to maintain the marital standard of living. She again requested an award of reasonable attorney's fees and costs incurred in connection to the motion.

On February 1, 2022, Husband again filed a motion requesting that the trial court adopt his proposed parenting plan as a temporary parenting plan pending the divorce proceedings. He averred that he had only seen the Children for one night since March

2021. Husband also averred that during what was to have been his holiday co-parenting time, he had only been able to see the Children on December 28, 2021. He alleged that Wife had withheld the Children from him and that the designated visitation supervisor had been out of town.

Husband's then-counsel, Leah E. Smith, filed a motion to withdraw on February 24, 2022, stating that a conflict had arisen between Husband and counsel. Wife filed a response, not opposing the motion to withdraw but requesting that the trial court sanction Husband personally for misrepresentations to the court. Wife averred that Husband had failed to appear for a scheduled contempt hearing on February 8, 2022, having told the court that he had tested positive for COVID-19 and was unable to participate in the hearing either in person or virtually. Wife alleged that through a private investigator, Husband had been observed in Texas on February 8, 2022, running outside, going to the gym without wearing a mask, and "leaving his residence in the company of others with at least one bottle of wine." Wife attached to her response an investigation report with the investigator's affidavit, photographs, and video taken of Husband. Wife subsequently presented the investigation report during a hearing on her second contempt motion.

On March 22, 2022, the trial court entered an order substituting attorney Fisher Wise as Husband's counsel. On March 28, 2022, Husband filed a motion to recuse the trial court chancellor, averring that during a contempt hearing in December 2021, the chancellor had noted for the record that a potential witness identified by Wife, Jack Silberman, was a friend to the chancellor. In his motion to recuse, Husband asserted that because Wife's counsel had subpoenaed email messages between Husband and Mr. Silberman, it was clear that Mr. Silberman's testimony would be important during the trial. The next day, Husband filed a motion to reduce his temporary child support and marital expense obligations while also filing an amended motion to recuse. Wife timely filed a response opposing the motion to recuse.

Following a hearing, the trial court entered two orders on April 20, 2022, in the first denying Husband's motion and amended motion to recuse. In addition to finding the motions procedurally deficient, the court found that Husband had filed the motions "for the improper purpose of causing a delay" and had "failed to assert any of the grounds for disqualification" contained in Tennessee Supreme Court Rule 10B. The court noted that when the chancellor had disclosed her personal relationship with Mr. Silberman in open court more than three months prior to Husband's filing the motion to recuse, Husband had raised no objection either orally in court or by timely written motion. Husband did not appeal the denial of his motion and amended motion to recuse.

Also on April 20, 2022, the trial court entered an order granting Wife's second motion for contempt upon finding that Husband had willfully failed to make timely child

support payments; failed to pay mortgage payments associated with the Marital Residence, vehicle payments, and expenses relative to the Lookout Mountain Club; and removed his credit card from the accounts for the parties' streaming service, the parties' food delivery service, and Wife's gym membership. Noting Husband's assertion that he was currently unemployed and did not have the means to make all the payments required of him, the court determined that Husband was "voluntarily unemployed and [had] chosen to satisfy certain other financial liabilities . . . ." Moreover, the court made an express finding that Husband's testimony was not credible. Finding a total arrearage, inclusive of child support and other support obligations, in the amount of $18,892.82, the court ordered Husband to pay $1,000.00 monthly to Wife on the arrearage. The court lifted the statutory injunction against dissipating marital property for "the limited purpose of allowing [Husband] to withdraw funds" from his simplified employee pension individual retirement account ("SEP-IRA") "to pay his temporary child support and/or satisfy the monthly liabilities of the mortgage for the marital residence, the Land Rover note, and The Lookout Mountain Club." Finally, the court found that Wife was entitled to an award of reasonable attorney's fees associated with her second contempt motion, and Wife subsequently filed an affidavit of reasonable attorney's fees related to that motion.

The trial court conducted a bench trial concerning all remaining contested issues in this case on September 29, 2022. In addition to the parties' testimonies, the court heard testimony from two property appraisers. Wife presented the testimony and report of Henry B. Glascock, who had appraised the Marital Residence at a value of $400,000.00. In setting his valuation, Mr. Glascock noted significant repairs that needed to be made on the Marital Residence, including structural repairs. Mr. Glascock testified that he had been contacted by Husband's former counsel and retained by both parties to render an independent appraisal report. Husband presented the testimony and report of Charles ("Chuck") E. Tindell, Jr., who appraised the Marital Residence at a value of $710,000.00. In setting his valuation, Mr. Tindell testified that he had incorporated the "sales comparison approach," focusing on the recent market for homes in the area where the Marital Residence was located. Mr. Tindell testified that he had been retained through Husband's counsel. At the close of trial, the court directed the parties to each file proposed findings of fact and conclusions of law solely as to Husband's income, which they did.

The trial court entered a "Memorandum Opinion and Final Decree of Divorce" on February 1, 2023, granting to Wife a divorce on stipulated grounds of adultery and inappropriate marital conduct. The court accepted Wife's proposed findings regarding Husband's income, finding his average gross monthly earnings since 2017 to have been $8,819.00 and his net monthly earnings to have been $8,321.00. Based on an estimate of his 2022 income, Husband had proposed a finding that his gross monthly income was

$5,667.00. The court also adopted Wife's proposed permanent parenting plan in full. In a section of the decree entitled, "CREDIBILITY," the court found "Wife to be credible" and stated that it had "repeatedly found Husband not to be credible in various hearings in this cause as well as the divorce trial." The court incorporated by reference its January 10, 2022 and April 20, 2022 orders finding Husband to be in contempt of court.

Regarding the division of the marital estate, the trial court first found that "all of the property belonging to the Parties is marital property." The only valuation the court found to be at issue was that of the Marital Residence. Noting that the parties had paid $445,000.00 for the Marital Residence, the court considered the two appraisers' testimonies and determined the fair market value to be $550,000.00.

Upon consideration of the applicable statutory factors, the trial court awarded the Marital Residence to Wife and set forth what it considered an equitable distribution of the parties' other assets and debts. The court awarded what it found to be a total of $869,583.00 in assets to Wife and subtracted what it found to have been a $99,500.00 gift to her from Husband for total assets awarded to her of $770,083.00. Subtracting $417,906.00 in liabilities allocated to Wife, including the mortgage related to the Marital Residence, the trial court calculated Wife's net portion of the marital estate to be worth $352,177.00.

The trial court awarded to Husband what it found to be a total of $250,471.00 in assets and $369,786.00 in liabilities for a net portion of the marital estate valued at negative (-) $119,315.00.[1] The court determined this division to be equitable because (1) "Husband incurred the credit card debt for his own purposes outside of the marriage or because of his infidelity," (2) Husband's testimony "that he had incurred $156,000 of household debt at the time of separation" was not credible, and (3) "Husband is better able to repay the debt." The court further found that "Husband does not have the income to pay Wife the alimony she deserves at this time."

Having adopted Wife's proposed findings as to Husband's income, averaged at $8,819.00 gross monthly or $8,321.00 net monthly, the trial court found Wife's gross monthly earnings to be $11,503.00 and her net monthly earnings, with estimated child support added, to be $8,485.00. Upon consideration of the factors provided in Tennessee Code Annotated § 36-5-121(i), the court awarded to Wife $100.00 in monthly transitional alimony.

---

[1] On appeal, Husband cites a mathematical error in the trial court's judgment, which Wife does not dispute. Wife, however, cites an additional mathematical error in the judgment and maintains that the errors counterbalance each other. We will address the alleged mathematical errors within our analysis of the trial court's distribution of the marital estate.

The trial court also awarded to Wife alimony *in solido* based on its finding that Husband had dissipated marital assets. The court initially made the finding of dissipation within its analysis of the factors applicable to distribution of the marital estate. In consideration of Tennessee Code Annotated § 36-4-121(c)(5)—acquisition, preservation, appreciation, depreciation, or dissipation of the marital assets—the court determined that Husband had dissipated a total of $133,688.00 in marital funds, spending those funds on S.S. and her son. The court awarded to Wife an alimony *in solido* award in the amount of $66,844.00, representing half of the dissipated funds, with $25,000.00 to be paid immediately and the remainder to be paid at a rate of $500.00 monthly plus interest at the statutory rate.

In preparation for trial, each party filed a proposed permanent parenting plan. Both parties proposed a phased approach to affording Husband unsupervised co-parenting time with the Children and both provided for joint major decision-making on behalf of the Children. In its divorce decree, the trial court expressly adopted Wife's proposed plan, which set forth three phases of residential parenting time for Husband: (1) supervised parenting time twice a week to be exercised in Chattanooga with no consumption of alcohol by Husband and use of a "Soberlink" device for ninety days after entry of the divorce decree; (2) unsupervised parenting time on alternate weekends to be exercised in Chattanooga with no consumption of alcohol by Husband and continued use of Soberlink for nine additional months after entry of the divorce decree; and (3) a conference between the parties or mediation to discuss allowing Husband to exercise parenting time in Texas and continued use of Soberlink, provided that Husband had remained sober during parenting time for twelve months after entry of the divorce decree.[2]

Before adopting Wife's proposed permanent parenting plan, the trial court conducted an analysis of the best interest factors provided in Tennessee Code Annotated § 36-6-106(a). The court particularly noted that Husband had not seen the Children since December 28, 2021, approximately nine months prior to trial. The court found, *inter alia*, that Husband had failed in December 2021 to exercise his holiday co-parenting time except for one day, had not followed the temporary parenting plan, had demonstrated a drinking problem, and had committed an act of domestic violence toward Wife in the presence of the Children. The court further found that although Husband telephoned the Children "a few times a week," the parties' daughter was "very timid about [Husband]." The court determined that Wife's proposed plan would "allow[] Husband to reestablish a relationship with [the] Children over a period of time" and that, considering all of the statutory factors, Wife's plan was in the best interest of the Children. The court directed

---

[2] The trial court further confirmed its adoption of Wife's proposed permanent parenting plan in an "Order Adopting Permanent Parenting Plan and Child Support Worksheets," entered on October 6, 2023, during the pendency of this appeal.

that Husband would need reunification therapy with the Children and that such should be paid for by Husband and should be "live in person and not virtual."

The trial court determined that Husband should pay Wife's reasonable attorney's fees incurred in the divorce proceedings as alimony *in solido* and directed Wife's counsel to file an affidavit of reasonable attorney's fees. In its final decree, the trial court also awarded what it found to be reasonable attorney's fees related to Wife's two successful contempt petitions in a total amount of $13,713.50.

Also in the final decree, the trial court directed Husband to continue paying $1,000.00 per month toward the temporary support arrearage he had incurred, of which $18,000.00 remained at the time of trial. Husband was also ordered to pay child support, which was reflected on the child support worksheet as a monthly obligation in the amount of $1,086.00. The court directed that Wife would maintain health and dental insurance for the Children and that Husband would maintain a $500,000.00 life insurance policy naming Wife and the Children as beneficiaries.

On February 14, 2023, Husband's trial counsel filed a motion requesting that he be allowed to withdraw from representation, and Wife filed a response objecting to the motion. Acting through his appellate counsel, Husband filed a notice of appeal with this Court on March 3, 2023. Meanwhile, Husband's trial counsel filed a notice in the trial court on March 6, 2023, that Husband had filed for chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Texas the day before. Following a hearing, the trial court entered an order on March 9, 2023, denying Husband's trial counsel's motion to withdraw upon determining that it could not rule on the motion to withdraw because "any action against the debtor is now stayed." On March 24, 2023, the trial court entered an agreed order substituting Husband's appellate counsel for his trial counsel.

Upon Wife's motion for attorney's fees and expenses and following a hearing, the trial court entered an order on March 9, 2023, awarding to Wife what it found to be reasonable attorney's fees and expenses incurred during the divorce proceedings in the amount of $64,387.50. The court found that as a domestic support obligation, the attorney's fee award fell under an exception to the automatic stay provision of 11 U.S.C. § 362(a). This Court entered an order on May 12, 2023, staying the appeal pursuant to 11 U.S.C. § 362(a). Husband subsequently notified this Court that his bankruptcy proceeding had resulted in an order of discharge pursuant to chapter 7 of the United States Bankruptcy Code. Following the filing of the parties' respective statements, wherein they each urged that the appeal should go forward, this Court entered an order on August 16, 2023, lifting the stay. This appeal then proceeded.

While this appeal was pending, Wife filed a third motion for civil contempt against Husband in the trial court on June 16, 2023, alleging violations of the July 2021 agreed order and the January 2022 order regarding civil contempt and payment of expenses. Wife simultaneously filed a motion for the trial court clerk to execute passport documents for the Children because Husband had allegedly refused requests to execute the documents despite an order entered by the trial court in February 2023 directing him to do so. The trial court entered an order on July 18, 2023, granting Wife's motion regarding the passports and directing the clerk and master to execute the Children's passport documents. Following a hearing during which Husband was represented by counsel but failed to appear personally, the trial court entered an order on October 6, 2023, again finding Husband in civil contempt of court for violating the January 2022 and July 2022 orders. The court directed Husband to continue paying timely child support and to pay "$50.00 per month to reimburse" Wife for the unpaid amounts. The court also granted to Wife reasonable attorney's fees related to her third contempt motion.

## II. Issues Presented

Husband presents four issues on appeal, which we have reordered and restated slightly as follows:

1. Whether the trial court erred in the division of the marital estate.

2. Whether the trial court erred in its award of alimony to Wife as to the duration, nature, and amount.

3. Whether the trial court erred by adopting Wife's proposed permanent parenting plan.

4. Whether the trial court erred in awarding to Wife attorney's fees in the form of alimony *in solido* while Husband's bankruptcy stay was in effect.

Wife presents the following additional issue, which we have likewise restated:

5. Whether Wife is entitled to an award of attorney's fees on appeal.

- 10 -

## III. Standard of Review

In a case involving the proper classification and distribution of assets incident to a divorce, our Supreme Court has explained the applicable standard of appellate review as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). *See Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence."). The valuation of a marital asset is a question of fact. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998).

Regarding spousal support, our Supreme Court has "repeatedly . . . observ[ed] that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). The High Court has further explained:

> [A] trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986

S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew* [*v. Burlew*], 40 S.W.3d [465,] 470 [(Tenn. 2004)]; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Id.* at 105-06 (footnotes omitted).

Respecting the trial court's decision concerning attorney's fees in a divorce action, this Court has stated:

Our review of an award of attorney's fees is guided by the principle that "'the allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion.'" *Mimms v. Mimms*, 234 S.W.3d 634, 641 (Tenn. Ct. App. 2007) (quoting *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005)). "Reversal of the trial court's decision [regarding] attorney fees at the trial level should occur 'only when the trial court applies an incorrect legal standard, reaches a decision that is illogical, bases its

decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party.'" *Church v. Church*, 346 S.W.3d 474, 487 (Tenn. Ct. App. 2010).

*Hernandez v. Hernandez*, No. E2012-02056-COA-R3-CV, 2013 WL 5436752, at *8 (Tenn. Ct. App. Sept. 27, 2013).

Additionally, this Court reviews a trial court's determination of an appropriate parenting plan according to an abuse of discretion standard. "[C]ustody and visitation arrangements are among the most important decisions confronting a trial court in a divorce case. The needs of the children are paramount; while the desires of the parents are secondary." *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). As this Court stated in *Gaskill*:

> Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law.

*Id.* at 631.

## IV. Equitable Distribution of Marital Estate

Husband contends that the trial court's overall distribution of the marital estate was incorrectly based on a mathematical error and was inequitable. Wife acknowledges that the trial court made the mathematical error alleged by Husband. However, she avers that a second mathematical error on the trial court's part resulted in an award to Husband of a greater share of the marital estate than he would have otherwise received. She thereby asserts that the trial court's mathematical errors are harmless. Wife further asserts that Husband has waived any other issue regarding distribution of the marital estate by failing to develop an argument on appeal beyond pointing out a mathematical error and recounting the trial court's findings. Upon review, we conclude that the parties have correctly noted mathematical errors in the trial court's marital estate distribution. However, we determine the overall effect of these errors to be harmless. We further determine that although Husband has raised an issue regarding the trial court's valuation of the Marital Residence, this valuation was supported by the evidence and within the trial court's discretion. We agree with Wife that Husband has waived any other specific

distribution arguments. However, particularly considering the negative award to Husband, we will address the trial court's overall distribution of the marital estate.

## A. Mathematical Errors in Final Decree

Wife does not dispute the mathematical error in the trial court's judgment described by Husband. In delineating the assets awarded to Husband, the court calculated the total of those assets at a value of $250,471.00 when the total actually equaled $155,852.00. We agree with the parties' calculation of $155,852.00 as the total amount of assets awarded to Husband as valued by the trial court.

Wife avers that the trial court committed a second mathematical error in the final decree by listing ten of Husband's credit card debts twice in the itemized list of liabilities assessed to Husband and then double counting those debts in the court's calculation of the total amount of debt allocated to Husband. Upon reviewing the court's itemized list of liabilities assessed to Husband, we agree that the court listed the following debts twice and erred by adding the associated amounts twice into the total:

| | |
|---|---|
| Chase Credit Card 2032: | $ 36,504.00 |
| Southwest Credit Card 5548: | 29,427.00 |
| Citi Advantage Plat 6195: | 30,059.00 |
| Citi Dividend 8283: | 9,978.00 |
| Citi Advantage Exec 3041: | 16,319.00 |
| Citi Advantage Exec 1716: | 19,637.00 |
| Citi Advantage Plat 0884: | 28,927.00 |
| Citi Prestige 7481: | 7,394.00 |
| Citi Advantage Exec 1678: | 1,283.00 |
| Citi Advantage Exec 8626: | 2,660.00 |
| | |
| Total Double-Counted Liabilities: | $182,188.00 |

The trial court thus erroneously added $182,188.00 in debt to the total assessed to Husband, resulting in the trial court's allocation of $369,786.00 in debt to Husband when the actual amount was $187,598.00. As Wife notes, the two errors together "resulted in Husband receiving $87,569 more in the marital division than was determined by the Trial Court to be equitable," meaning that Husband received a net award from the marital estate of negative (-) $31,746.00 rather than negative (-) $119,315.00, as the trial court found in its final decree.

Wife does not request modification of the distribution based on the trial court's error in totaling Husband's liabilities. Husband did not file a reply brief and did not

respond during oral argument to Wife's explanation of the court's mathematical error in double-counting ten of the liabilities assessed to him. In reviewing whether the trial court's distribution of the marital estate was equitable, we will consider the corrected net amount awarded to Husband of negative (-) 31,746.00.

## B. Waiver

Wife asserts that the mathematical error cited by Husband in his appellate brief is his "principal complaint" regarding the distribution of the marital estate and that he has waived any other issue pertaining to distribution. In the argument section of his appellate brief, Husband sets forth a general summary of the applicable law, inclusive of the discretionary standard of review, and describes the trial court's findings with citations to the record indicating the location of those findings. Wife is correct, however, that Husband's sole allegation of specific error in this section concerns the mathematical error involving the total assets awarded to him, as described above. In the conclusion of his brief, Husband states: "With regard to the valuation of the marital residence it is far below the true value of the marital residence which should be sold and the proceeds divided between the parties." Husband also states in his conclusion that "[t]he division of marital assets and liabilities is not only unequal but inequitable based on incorrect figures."

Tennessee Rule of Appellate Procedure 27(a)(7)(A) provides that an appellant's brief shall contain an argument section setting forth, in pertinent part, "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . ." Similarly, Tennessee Court of Appeals Rule 6(a)(1) provides that written argument regarding each issue shall contain, *inter alia*, "[a] statement by the appellant of the alleged erroneous action of the trial court which raises the issue . . . ." This Court has explained that it is "under no duty to verify unsupported allegations in a party's brief, or for that matter consider issues raised but not argued in the brief." *Bean v. Bean*, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000). As our Supreme Court has instructed:

> It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.

*Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010).

Upon review, we determine that Husband has minimally raised a sub-issue concerning the trial court's valuation of the Marital Residence and that he has raised a challenge to the overall equity of the trial court's distribution. However, Husband has waived any challenge to other specific actions taken by the trial court in distributing the marital estate by failing to develop his argument beyond bare statements of the trial court's findings.

For example, in its final decree, the trial court explained its gift finding as follows:

The Parties made $178,000 on the sale of the house in California. Exhibit 20 is entitled "Gift Letter" and is dated June 14, 2018. It reflects that Husband made a $99,500 gift to Wife to be applied toward the purchase of the [Marital Residence] and that there will be no repayment. This letter was provided to the mortgage lender. This gift was used for the down payment on the home. This was an arrangement the Parties agreed to for whatever reasons, prior to the separation and prior to coming to court which this Court finds was a gift from Husband to Wife just as a nice piece of jewelry would have been a gift.

In Husband's statement of the facts, he states:

The Trial Court made a notation that the total of $869,583.00 [of assets awarded to Wife] was reduced by a gift of $99,500.00 from Husband to Wife when the home was initially purchased. (Memo. p. 13) The reduction is not explained, nor is there a basis for such a deduction.

Within the argument section of his appellate brief, Husband summarizes the trial court's gift finding, stating: "The trial court made a notation that the total of $869,583.00 was reduced by a gift of $99,500.00 from Husband to Wife when the home was initially purchased." Husband does not address the gift finding any further, presenting no argument or authority concerning whether the trial court erred in determining that Husband's "Gift Letter" constituted a gift from one party to the other.[3] We therefore

_____

[3] Concerning the elements required to establish a gift, this Court has explained:

The party asserting that they acquired the property by gift has the burden of proving the essential elements of a gift by clear and convincing evidence: (1) "the intention by the donor to make a present gift," and (2) "the delivery of the subject gift by which complete dominion and control of the property [was] surrendered by the donor." *See Hansel v. Hansel*, 939 S.W.2d 110, 112 (Tenn. Ct. App. 1997); *Brewer v. Brewer*, No. M2010-00768-COA-R3-CV, 2011 WL 532267 at *3 (Tenn. Ct. App. Feb. 14, 2011).

*Trezevant v. Trezevant*, 568 S.W.3d 595, 615 (Tenn. Ct. App. 2018).

- 16 -

deem any sub-issue Husband may have intended to raise regarding the gift letter to have been waived due to the skeletal nature of his assertion. *See Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006) ("A skeletal argument that is really nothing more than an assertion will not properly preserve a claim.").

Similarly, in recounting what the "evidence in this case showed" within the argument section of his brief devoted to the marital estate distribution, Husband states:

> Wife had cashed in an account that the trial court found she had with her mother in the amount of $132,000.00 in March, 2021. The wife would not disclose the whereabouts of those funds and claimed it was used to pay bills and attorney fees.

Husband has presented neither an argument concerning the trial court's consideration of this account nor any citations to the record or authorities applicable to the above statement.[4] Any sub-issue Husband may have intended to raise regarding Wife's account with her mother is therefore waived, as is any other sub-issue he may have intended to raise by simply stating the trial court's findings without further development of an argument. *See id.*

## C. Valuation of Marital Residence

Husband contends that the trial court valued the Marital Residence at "far below the true value." The trial court found that the fair market value of the Marital Residence was $550,000.00 and awarded it to Wife along with the associated mortgage debt of $339,552.00. Two experts testified during trial regarding the value of the Marital Residence: Mr. Glascock estimated a value of $400,000.00 while Mr. Tindell estimated $710,000.00. Wife posits that the court's valuation was within its discretion based on the evidence presented. Upon careful review, we agree with Wife on this issue.

As this Court has explained concerning a trial court's valuation of marital property:

> The value of marital property is a question of fact, and a trial court's decision with regard to the value of a marital asset should be given great weight on appeal. *See Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct.

---

[4] In its final decree, the trial court found regarding Wife's account with her mother:

> Wife's bank account at Travis Credit Union is an account [] that she has had with her mom since she was a child. She withdrew $132,000 from this account the day Husband got out of jail to pay household bills and attorney's fees.

App. 1987); *Lunn* [*v. Lunn*], [No. E2014-00865-COA-R3-CV,] 2015 WL 4187344, at \*4 [(Tenn. Ct. App. June 29, 2015)]. A trial court's decision with respect to the valuation of a marital asset will be presumed to be correct unless the evidence preponderates otherwise. *See Wallace*, 733 S.W.2d at 107. The trial court should determine the value of a marital asset by considering all relevant evidence regarding value, and the parties are bound by the evidence they present. *Id.* The trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted. *Id.*

*Chase v. Chase*, 670 S.W.3d 280, 302-03 (Tenn. Ct. App. 2022). As to the weight afforded to expert testimony, this Court has further explained:

> [T]he "weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact." *Brown* [*v. Crown Equip. Corp.*], 181 S.W.3d [268,] 275 [(Tenn. 2005)]. "Expert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in character, and the trier of fact may place whatever weight it chooses on such testimony." *Thurmon v. Sellers*, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001). "Moreover, it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation." *Hinson v. Wal-Mart Stores, Inc.*, 654 S.W.2d 675, 676-77 (Tenn. 1983).

*Id.* at 295 (quoting *Gergel v. Gergel*, No. E2020-01534-COA-R3-CV, 2022 WL 1222945, at \*9 (Tenn. Ct. App. Apr. 26, 2022)).

In valuing the Marital Residence, the trial court made the following specific findings of fact:

> The Husband's first attorney hired Mr. Glascock to appraise the marital residence. He performed the appraisal for both Parties. Both Parties were billed for his fee. The effective date of Mr. Glascock's appraisal is November 9, 2021. Mr. Glascock appraised the marital residence at $400,000. Mr. Glascock testified that value would be higher as of the September 29, 2022, trial date, due to the market.

> The Husband's second attorney hired Mr. Chuck Tyndale as an appraiser. The effective date of Mr. Tyndale's appraisal is August 10, 2022. Mr. Tyndale explained that as of August 2022, there was an extremely high demand for homes on Lookout Mountain under one million

dollars. The Court takes judicial notice that the interest rates have increased substantially since the time of the appraisals. Mr. Tyndale appraised the Property at $710,000. His appraisal was as-is and did not include the AFS report.[5]

Mr. Tyndale testified that a sophisticated cash buyer would ignore the needed repairs, but a bank lending on the property would require that the repairs be made to the foundation before lending. Mr. Tyndale further testified that vacant lots on Lookout Mountain, similar in area to the area of this property, are selling for $250,000. However, the Court finds that if some buyer were to purchase this Property for the lot alone there would be a cost incurred for demolishing the house.

The Court finds that both Mr. Glascock and Mr. Tyndale are experts in appraising property in Hamilton County and both have testified many times in this court and other Hamilton County courts. Mr. Glascock has lived on Lookout Mountain for basically his entire life and has bought and sold multiple properties on Lookout Mountain. In fact, he lives near the subject Property. The Court finds Mr. Glascock's expertise of Lookout Mountain properties to be slightly more persuasive.

The [Marital Residence] formerly had a detached carport, but since it was collapsing, the Parties had to tear it down. So there is an upstairs door that leads outside to nowhere as it formerly led to a deck that connected to the roof of that carport. Collective Exhibit 4 shows a piece of black tarp covering the siding for a moisture barrier and demonstrates the significant crack in the subfloor under the parquet flooring. The windows need to be replaced. The house was built in 1955 and is 67 years old. There are cosmetic deficiencies and significant settling. There is moisture in the crawl space. There is an estimate from AFS of $66,000 to repair and remediate certain areas including the crawlspace and foundation. The windows do not shut so water has caused damage. The windows need to be replaced. The bathrooms are dated. There is a hole in the bathroom door. The house is not located on the brow of the mountain, which is a much more valuable location. Repairs in the amount of $100,000 are needed. The Parties intended to perform the repairs prior to the Husband's affair.

---

[5] AFS is a licensed contractor that had provided an estimate to Wife for certain repairs to the Marital Residence, and Wife presented the estimate as an exhibit at trial.

From all of which the Court finds that the marital residence has a fair market value (FMV) of $550,000.

(Internal citation to record omitted.)

The trial court considered both experts' testimonies and made detailed findings supporting its determination that the fair market value of the Marital Residence was $550,000.00, an amount only slightly closer to Mr. Glascock's estimate of $400,000.00 than it was to Mr. Tyndale's estimate of $710,000.00. *See Chase*, 670 S.W.3d at 303 ("The trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted."). We conclude that the trial court's valuation of the Marital Residence was supported by a preponderance of the evidence and was well within the court's discretion.

### D. Equitable Distribution

Husband contends that the trial court's distribution of the marital estate was inequitable. However, other than pointing out the mathematical error in the trial court's addition of the total assets awarded to him and questioning the valuation of the Marital Residence, Husband does not explain why he believes the distribution to be inequitable. Thus, we are somewhat constrained in addressing this issue. *See, e.g.*, *Christie v. Christie*, No. M2012-02622-COA-R3-CV, 2014 WL 4293966, at *4 (Tenn. Ct. App. Aug. 28, 2014) ("We are somewhat constrained in addressing this issue inasmuch as, other than pointing out certain testimony relative to marital assets and debts, [the appellant] has not asserted specific error in the court's division of marital property or debt."). Because a straightforward review of the distribution raises a question as to whether the negative award to Husband was equitable, we will review the trial court's rationale for this distribution. *See, e.g.*, *Schrader v. Schrader*, No. E2005-02641-COA-R3-CV, 2007 WL 27118 (Tenn. Ct. App. Jan. 4, 2007) (determining that although "certain of the factors" favored the wife in distribution of the marital assets, "leaving Husband in a negative position" could not be "characterized as equitable"). As noted above, although the trial court's mathematical errors resulted in a total net award to Husband from the marital estate greater than the trial court initially calculated, the award was still a negative one at the time of the divorce judgment, equaling (-) $31,746.00, with the total net award to Wife valued by the trial court at $352,177.00.

The version of Tennessee Code Annotated § 36-4-121(c) (West July 1, 2018, to March 30, 2022) in effect at the time the instant complaint was filed provided:

(c)    In making equitable division of marital property, the court shall consider all relevant factors including:

(1)     The duration of the marriage;

(2)     The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3)     The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4)     The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B)     For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed;

(6)     The value of the separate property of each party;

(7)     The estate of each party at the time of the marriage;

(8)     The economic circumstances of each party at the time the division of property is to become effective;

(9)     The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10)    In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including

valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;

(11) The amount of social security benefits available to each spouse; and

(12) Such other factors as are necessary to consider the equities between the parties.

In its final decree, the trial court set forth specific findings of fact applicable to each statutory factor but only considered the statutory factors as they were provided in a prior version of Tennessee Code Annotated § 36-4-121(c). Effective July 1, 2017, the General Assembly amended Tennessee Code Annotated § 36-4-121(c) by adding a new subdivision (10) addressing valuation of a "closely held business or similar asset" and renumbering the subsequent subdivisions. *See* 2017 Tenn. Pub. Acts, Ch. 309, § 1 (H.B. 348). The trial court did not address this factor. Two of the assets awarded to Husband were accounts that he testified were related to a former business for which he was the sole proprietor, Open Click LLC ("Open Click"), but no valuation of Open Click was presented by either party. Particularly considering Husband's testimony during the March 2022 contempt hearing that he had been "forced to shut down [his] business" in February 2021, we determine the trial court's omission of factor ten to have been harmless error.

In weighing the first four statutory factors, the trial court found that the parties had been married for eleven years and that both were in "good physical and mental health." The court stated that both were "employable," "currently employed," and "enjoy[ed] a good earning capacity." The court also found that each party "contributed to the earning power of the other" while determining that "[Husband's] past income demonstrates he has the greater ability to make more income and a greater ability for future acquisitions of capital assets."

Regarding factor five, the trial court first found that "both Parties contributed to the acquisition and appreciation of the assets." The court then considered Wife's allegation that Husband had dissipated marital assets and concluded that Wife had proven Husband's dissipation in the amount of $133,688.00. Husband does not dispute that he dissipated marital assets, but he maintains that the amount of those assets was much

- 22 -

lower than Wife claimed. As the court stated in its order: "Husband testified that by his calculations he only spent $9,000 on his girlfriend." The trial court considered dissipation as a factor in distributing the marital estate. However, the court awarded to Wife half of what it found to be the dissipated assets as alimony *in solido* rather than dividing the dissipated assets within the estate distribution, stating that this amount "comes off the top and is separate from the division of assets." *See, e.g.*, *Halkiades v. Halkiades*, No. W2004-00226-COA-R3-CV, 2004 WL 3021092, at *4 (Tenn. Ct. App. Dec. 29, 2004) (affirming the trial court's award of half the dissipated assets as alimony *in solido*).

In the argument section of his brief devoted to alimony, Husband asserts that this alimony *in solido* award to Wife, granted to offset half of the dissipated assets, was "not supported by the evidence." He does not address dissipation in the section of his brief devoted to the distribution of the marital estate except to state that the court cited Husband's "credit card debt for his own purposes outside of the marriage" as one reason for the distribution. Inasmuch as Husband admitted some dissipation and failed to argue error in the trial court's weighing of factor five in the distribution, we conclude that Husband waived any issue regarding the court's consideration of dissipation as a factor in equitable distribution. We will further review the court's dissipation finding in our analysis of Husband's alimony issue.

The trial court determined that the value of separate property (factor six) was not relevant to this case because neither party owned separate property. Concerning factors seven and eight (the estate of each party at the time of the marriage and the economic circumstances of each at the time of divorce), the court determined that Husband had "incurred debt since separating from the family" and that he had withdrawn $115,561.30 from his SEP-IRA on April 5, 2022, during the pendency of the divorce. Although the trial court had stated in its order on Wife's second motion for contempt, entered on April 20, 2022, that Husband would be allowed to "withdraw funds" from his SEP-IRA "to pay his temporary child support and/or satisfy the monthly liabilities of the mortgage for the marital residence, the Land Rover note, and The Lookout Mountain Club," Husband testified at trial that he had liquidated the entire SEP-IRA on April 5, 2022, and deposited those funds into an Ally Bank account from which he was paying the liabilities set forth in the April 2022 order. Regarding factor nine (taxes and reasonably foreseeable expenses associated with assets), the court found that Husband "may incur taxes for withdrawals from the SEP-IRA," that Wife "may be required to pay capital gains tax" on stock she had sold from "her e-trade account to pay household bills after the separation," and that Wife "will need to make repairs to the marital residence in the amount of approximately $100,000." The court found that Social Security benefits were not a factor for these parties.

Concerning the other factors, the court set forth the details of the 2018 "Gift Letter" from Husband to Wife, as noted above, and stated the following additional findings:

Over the course of the marriage, Husband paid the initiation fee and the monthly bills to four country clubs. He also paid the mortgage and made the payments on Wife's Range Rover. Husband paid for the family vacations.

The Parties moved to Tennessee from California to save on taxes and for more affordable housing. In California the Parties managed to pay $9,000 more each month on their combined mortgage and California taxes than they pay here in Hamilton County. The Parties made $178,000 on the sale of the house in California.

* * *

Husband incurred a lot of credit card debt after the separation. The Court finds that Husband incurred the debt and benefitted from the charges. The Court concludes that each Party is responsible for their credit card debt.

The trial court thereby found that an important factor in equitably dividing the marital estate was the large amount of debt incurred by Husband after the separation for his own benefit. In a recent case wherein the husband argued that the division of the marital property was inequitable in part because he had been assessed with all of the parties' indebtedness, this Court clarified:

On this issue, this Court has explained that "[t]he division of the marital estate includes both the division of the marital property and the allocation of the marital debt[.]" *Perkins* [*v. Perkins*], [No. W2021-01246-COA-R3-CV,] 2023 WL 2446807, at *3 (quoting *Owens* [*v. Owens*,] 241 S.W.3d [478,] 490 [Tenn. Ct. App. 2007]). "[W]hen allocating marital debts, the following factors are to be taken into account: '(1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt.'" *Id.* (quoting *Alford v. Alford*, 120 S.W.3d 810, 814 (Tenn. 2003)). The Tennessee Supreme Court has observed that "[a] careful application of these factors will insure the fairest possible allocation of debt" and "will also protect the spouse who did not incur the debt from bearing

- 24 -

responsibility for debts that are the result of personal excesses of the other spouse." *Alford*, 120 S.W.3d at 814.

*Prichard v. Prichard*, No. W2022-00728-COA-R3-CV, 2023 WL 2726776, at *11 (Tenn. Ct. App. Mar. 31, 2023) (affirming the trial court's distribution of the marital estate).

In this case, the trial court summarized its rationale for what it found to be the equitable distribution of the marital estate as follows:

> The Court finds this division of assets and liabilities to be equitable because, inter alia, Husband incurred the credit card debt for his own purposes outside of the marriage or because of his infidelity. Husband testified that he had incurred $156,000 of household debt at the time of separation, but the Court has found Husband not to be credible in this action. The Court finds that based on his history of funds deposited, Husband is better able to repay the debt. Moreover, Husband does not have the income to pay Wife the alimony she deserves at this time . . . so this is another factor that makes this division of assets and liabilities "equitable."

(Internal citation omitted.) The court thus considered the factors set forth in *Alford* when apportioning debt between the parties.

Additionally, the trial court made the following finding under the heading of "CREDIBILITY" in its divorce order:

> The Court found Wife to be credible. The Court has repeatedly found Husband not to be credible in various hearings in this cause as well as in the divorce trial. The Court incorporates herein by reference its Orders entered January 10, 2022, and April 20, 2022.

In the January 10, 2022 and April 20, 2022 orders, the trial court found Husband to be in willful contempt of court. In the April 2022 contempt order, the court found that Husband's testimony was "not credible." The court further found that Husband was "voluntarily unemployed" and that rather than satisfying child support and other agreed-upon liabilities, he had "chosen to satisfy certain other financial liabilities including, but not limited to rent ($2,500.00/month) for a townhome not occupied by [Husband] and a recent payment of approximately $15,000.00 towards [Husband's] credit card debt." In the divorce order, the court determined Husband's insistence that he had incurred debt since the separation for the parties' household expenses not to be credible. We reiterate that we afford considerable deference to the trial court's credibility findings. *See Keyt*, 244 S.W.3d at 327.

Finally, we address Husband's filing of a chapter 7 bankruptcy action in a Texas federal court after the trial court's entry of the divorce order. Within its analysis of the alimony statutory factors, the trial court, in describing the parties' standard of living established during the marriage, *see* Tenn. Code Ann. § 36-5-121(i)(9), noted that Husband had "not sought bankruptcy relief." However, by the time the trial court issued its final order in this action on March 9, 2023, awarding attorney's fees and expenses to Wife, Husband had given notice to the court that he had filed for bankruptcy protection a few days before. Therefore, the notice of filing for bankruptcy was before the trial court and is in the appellate record for our review. Additionally, Husband filed with this Court a copy of the order of discharge entered by the bankruptcy court during the pendency of this appeal.

Pursuant to Tennessee Rule of Appellate Procedure 14(a), this Court may consider post-judgment facts on its own motion and in its discretion. Rule 14(a) further provides that "consideration generally will extend only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters" (emphasis added). We recognize that the trial court was "charged with distributing the assets and debt as of the time of the divorce," prior to Husband's filing for bankruptcy. *See Christie* 2014 WL 4293966, at *5 (emphasis added). In the divorce judgment, the trial court noted that Husband had not filed for bankruptcy, apparently finding this to be an indication that Husband was drawing from some financial resources to keep from claiming bankruptcy despite the high amount of debt he had incurred after the parties' separation. However, we take judicial notice of the post-judgment fact that many of the debts assessed to Husband in the divorce would have been discharged through his bankruptcy proceeding immediately following the divorce. *See* Tenn. R. App. P. 14(a).

Therefore, upon somewhat different reasoning than that employed by the trial court, we determine that the negative total distribution to Husband, inclusive of the debts assessed to him, many of which were discharged in bankruptcy during the pendency of this appeal, resulted in an equitable distribution of the marital estate. *See Torres v. Bridgestone/Firestone N. Am. Tire, LLC*, 498 S.W.3d 565, 577 (Tenn. Ct. App. 2016) ("This Court may affirm the trial court even if the trial court reached the correct result for the wrong reason."). Moreover, considering the trial court's thorough consideration of the statutory factors at the time of the divorce judgment and its credibility determinations, we find that the evidence preponderated in favor of the trial court's division of the marital property at the time of the divorce judgment's entry. Accordingly, Husband is not entitled to relief on this issue. *See Halkiades*, 2004 WL 3021092, at *6 ("We are not inclined to disturb the trial court's decision unless the preponderance of evidence

- 26 -

compels a different determination or the trial court's division results from an error of law or incorrect application of the statutory requirements.").

## V. Alimony

Husband contends that the trial court erred in its determination of the duration, nature, and amount of its alimony awards to Wife. The court awarded transitional alimony to Wife in the amount of $100.00 monthly, directing that it would be modifiable but not setting a determinate timeframe. The court also granted to Wife two awards of alimony *in solido*, one in the amount of $66,844.00, representing half of what the court found to be the assets dissipated by Husband, and the other in the amount of $64,387.00 based on Wife's reasonable attorney's fees related to the divorce. Husband specifically argues that the court erred in (1) finding that Husband had the ability to pay alimony; (2) failing to set a determinate time period for transitional alimony; (3) determining the total amount of dissipated marital assets as $133,688.00 and awarding to Wife half that amount as alimony *in solido*; and (4) awarding attorney's fees to Wife as alimony *in solido*.

Wife acknowledges that the trial court erred by failing to set a determinate period for transitional alimony. However, she maintains that the court properly weighed the statutory factors to find that Wife needed alimony and that Husband had the ability to pay $100.00 monthly. She requests that this Court either "recategorize" the transitional alimony or set a determinate time period. Concerning the alimony *in solido* award for dissipated assets, Wife asserts that the trial court correctly determined that Wife had established proof of $133,688.00 in marital assets dissipated by Husband and that Husband had failed to refute that evidence. Wife also maintains that the trial court acted within its discretion in awarding to Wife attorney's fees as alimony *in solido*. Upon thorough review of the record and applicable authorities, we conclude that the evidence does not preponderate against the trial court's findings that Wife had the need for and Husband had the ability to pay $100.00 monthly in transitional alimony and that Husband had dissipated $133,688.00 in marital assets. Furthermore, we discern no abuse of discretion in the court's awards to Wife of alimony *in solido* for one-half of the dissipated assets and for Wife's attorney's fees incurred in the divorce. However, we agree with the parties that transitional alimony must be set for a determinate period of time.

Regarding the types of alimony that may be awarded, Tennessee Code Annotated § 36-5-121(d) (West March 31, 2022, to current) provides:

(1)     The court may award rehabilitative alimony, alimony in futuro, also known as periodic alimony, transitional alimony, or alimony in

solido, also known as lump sum alimony or a combination of these, as provided in this subsection (d).

(2)     It is the intent of the general assembly that a spouse, who is economically disadvantaged relative to the other spouse, be rehabilitated, whenever possible, by the granting of an order for payment of rehabilitative alimony.  To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

(3)     Where there is relative economic disadvantage and rehabilitation is not feasible, in consideration of all relevant factors, including those set out in subsection (i), the court may grant an order for payment of support and maintenance on a long-term basis or until death or remarriage of the recipient, except as otherwise provided in subdivision (f)(2)(B).

(4)     An award of alimony in futuro may be made, either in addition to an award of rehabilitative alimony, where a spouse may be only partially rehabilitated, or instead of an award of rehabilitative alimony, where rehabilitation is not feasible.  Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.

(5)     Alimony in solido may be awarded in lieu of or in addition to any other alimony award, in order to provide support, including attorney fees, where appropriate.

Tennessee Code Annotated § 36-5-121(i) (West March 31, 2022, to current) provides the following factors to be considered, as relevant, when determining whether an award of spousal support is appropriate, and if so, "the nature, amount, length of term, and manner of payment" to be awarded:

(1)     The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2)     The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3)     The duration of the marriage;

(4)     The age and mental condition of each party;

(5)     The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6)     The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7)     The separate assets of each party, both real and personal, tangible and intangible;

(8)     The provisions made with regard to the marital property, as defined in § 36-4-121;

(9)     The standard of living of the parties established during the marriage;

(10)    The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11)    The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12)    Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

As our Supreme Court has elucidated, "[a]lthough each of these factors must be considered when relevant to the parties' circumstances, 'the two that are considered the

most important are the disadvantaged spouse's need and the obligor spouse's ability to pay.'" *Gonsewski*, 350 S.W.3d at 110 (quoting *Riggs v. Riggs*, 250 S.W.3d 453, 457 (Tenn. Ct. App. 2007)). Moreover, this Court has confirmed that when "considering these two factors, the primary consideration is the disadvantaged spouse's need." *Murdock v. Murdock*, No. W2019-00979-COA-R3-CV, 2022 WL 611024, at *14 (Tenn. Ct. App. Mar. 2, 2022).

The trial court made specific findings of fact concerning each statutory factor. As to factor one (the relative earning capacity, obligations, needs, and financial resources of each party), the court found that Wife had been employed by Sales Force, "a digital marketing company for nine years" and that her gross monthly earnings at the time of trial were $11,503.00. Determining Wife's net monthly income to be $8,485.00, the court accepted Wife's claimed monthly expenses of $11,520.00, finding a "shortfall" for Wife of $3,035.00 monthly. The court noted that although Wife's "2020 W2 reflects $170,000 a year salary," she "now makes $3,000 less a year simply by the family moving to Tennessee based on her company's adjusted salary rate for Tennessee residents versus California residents."

Regarding Husband's financial situation, the trial court found that he had worked in online advertising in a commission-based business, receiving a commission if he made a profit. The court further found that Husband had "started working with a Wisconsin company in March of 2022" and "does not receive a commission any longer." After considering the parties' respective proposed findings regarding Husband's income, the court expressly "accept[ed] and adopt[ed] [Wife's] proposed findings as to Husband's true income averages since 2017." The court thereby found that Husband's gross monthly earnings were $8,819.00 and that his monthly net earnings were $8,321.00. The court noted Husband's claimed monthly expenses, which included $3,332.00 total in living expenses, estimated child support and arrearage payments, and an Internal Revenue Service debt payment, plus an additional $46,900.00 Husband claimed in monthly credit card debt payments. The court summarized regarding factor one:

> The Court finds Wife needs $3,035 a month in alimony just to break even. Through no fault of her own, the Wife will not be able to enjoy the lifestyle to which she was accustomed in the marriage.

Concerning factors two through five, the trial court found that Husband and Wife had been married for eleven years, were respectively thirty-nine and thirty-eight years of age at the time of trial, and both enjoyed good mental and physical health. The court determined that factor six (whether it would be undesirable for either party to seek employment outside the home due to child care responsibilities) was not a factor in this case. The court also determined that factor seven did not impact the analysis because

neither party had separate property. As to factor eight (provisions regarding marital property) the court incorporated its "findings and ruling on the division of assets and liabilities," as described in the preceding section of this Opinion.

The trial court made the following specific findings of fact in relation to factor nine, the standard of living established by the parties during the marriage:

> The Parties enjoyed a very nice standard of living.
>
> They are members of four country clubs.
>
> They took nice vacations. They drive nice cars.
>
> Husband testified that the country club dues alone last year were $70,000.
>
> While living in California the Parties paid $9,000 more a month in CA taxes and mortgage payments than they were paying here in Tennessee or a total of $108,000 more a year.
>
> Husband paid $2500 a month in rent for his apartment in Chattanooga.
>
> Yet Husband's income reported to the IRS since 2017 averages less than $70,000.
>
> It appears that Husband was paying for many of the household expenses through his businesses.
>
> In 2019 Husband deposited over $730,000 into his Ally Bank account.
>
> In 2020 Husband deposited over $629,000 into his Ally Bank account.
>
> In 2021 Husband deposited over $858,000 into his Ally Bank account.
>
> Husband has not sought bankruptcy relief.

The Court is convinced that once this divorce is over, Husband's revenues will increase again.

So Husband can afford to pay alimony.

Regarding factor ten (tangible and intangible contributions to the marriage) the trial court found that "[b]oth parties contributed to the marriage until Husband began his affair in September of 2020 . . . ." Concerning fault, factor eleven, the court "deem[ed] it appropriate to factor in the fault of Husband to the award of alimony" due to his infidelity, which the court found had "ruined the marriage." In its findings related to factors ten and eleven, the court appeared to emphasize what it stated was a one-month time period between the parties' relocation from California to Tennessee and the beginning of Husband's affair.

On appeal, Husband does not dispute the trial court's finding concerning when his affair began, but he does dispute the court's finding concerning when the parties' moved from California, stating: "The testimony was that the parties moved to Tennessee from California in July of 2018." Although Husband failed to cite to the record for this statement, we note that Wife testified that the parties had obtained an estimate for needed repairs to the Marital Residence in 2018. Wife also testified that the parties had timed their move so that they would arrive in Chattanooga before the beginning of the academic year. These two facts taken together indicate that the parties relocated to Chattanooga in approximately July of 2018. Contrary to Husband's argument, however, we do not discern that the trial court relied on the length of time between the parties' relocation and the beginning of Husband's affair when attributing fault to Husband for the demise of the marriage. Indeed, the trial transcript reflects that the parties announced a stipulation at trial that Husband was at fault in the divorce. Accordingly, we determine the court's mistaken finding regarding the date of the parties' relocation from California to Tennessee to have been harmless error.

In considering factor twelve (such other factors, including tax consequences, necessary to the equity of the parties), the trial court specifically found:

Husband may incur tax consequences for withdrawing from his IRA.

Wife may incur tax consequences from her e-trade transactions.

Wife's bank account at Travis Credit Union is an account [] that she has had with her mom since she was a child. She withdrew $132,000 from this account the day Husband got out of jail to pay household bills and attorney's fees.

Husband is a member of four country clubs. Wife does not play golf. Wife suggested changing the club memberships from full golf club membership to only a social membership to reduce the dues but Husband refused, because he likes to play golf.

At the time of trial, Husband was $18,000 in arrears on the temporary support order entered April 20, 2022. He pays $1000 a month toward the arrearages on country club dues, car payment[,] child support, and the mortgage.

Husband has not sought bankruptcy relief. He has a monthly payoff plan with the IRS of $432 a month. He is spending about $4000 a month from the SEP-IRA.

The trial court concluded in pertinent part:

Wife is the disadvantaged spouse and has a shortfall of around $3,000 a month. As to the Husband's ability to pay, the Court finds that currently Husband is not able to pay what Wife deserves. The Court notes the amount of alimony should be determined so that the party obtaining the divorce is not left in a worse financial situation than she had been before the Husband's misconduct brought about the divorce. *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Wife is left in a worse financial situation than she had been before the Husband's misconduct. However, at this time, the Husband's income does not reflect the ability to pay sufficient alimony to make up the shortfall. Because the Court determines that the Husband's income will increase shortly after the divorce the Court orders that the transitional alimony is modifiable.

* * *

From all of which the Court concludes that Husband shall pay to Wife the sum of $100.00 a month as transitional alimony which is modifiable.

Husband shall immediately pay a lump sum of $25,000 toward the dissipation as alimony in solido. Additionally Husband shall pay to Wife the sum of $500 a month to pay for the remaining balance of the dissipation of $41,844 ($66,844 - $25,000) as alimony in solido with interest running on the balance at the statutory rate.

- 33 -

## A. Transitional Alimony

Regarding transitional alimony, Tennessee Code Annotated § 36-5-121(g)(1) (West March 31, 2022, to current) provides:

> Transitional alimony means a sum of money payable by one (1) party to, or on behalf of, the other party for a determinate period of time. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.

As our Supreme Court has explained:

> Simply put, this type of [transitional] alimony "aid[s] the person in the transition to the status of a single person." *Mills v. Mills*, No. M2009-02474-COA-R3-CV, 2010 WL 3059170, at *5 (Tenn. Ct. App. Aug. 4, 2010); *see also Montgomery v. Silberman*, No. M2009-00853-COA-R3-CV, 2009 WL 4113669, at *2 (Tenn. Ct. App. Nov. 24, 2009) (affirming trial court's award of transitional alimony to wife "to bridge the gap, so to speak, between her married life and single life"); *Engesser v. Engesser*, 42 So. 3d 249, 251 (Fla. Dist. Ct. App. 2010) (en banc) (describing transitional alimony as "[b]ridge-the-gap alimony" designed to "smooth the transition of a spouse from married to single life"). In contrast to rehabilitative alimony, which is designed to increase an economically disadvantaged spouse's *capacity* for self-sufficiency, transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income. As such, transitional alimony is a form of short-term support. Transitional alimony is payable for a definite period of time and may be modified only upon certain circumstances: (1) the parties agree that it may be modified; (2) the court provides for modification in the divorce decree; or (3) the recipient spouse resides with a third person following the divorce. Tenn. Code Ann. § 36-5-121(g)(2).
>
> The statutory framework for spousal support reflects a legislative preference favoring short-term spousal support over long-term spousal support, with the aim being to rehabilitate a spouse who is economically

disadvantaged relative to the other spouse and achieve self-sufficiency where possible. *See* Tenn. Code Ann § 36-5-121(d)(2)-(3); *Bratton* [*v. Bratton*], 136 S.W.3d [595,] 605 [(Tenn. 2994)]; *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003). Thus, there is a statutory bias toward awarding transitional or rehabilitative alimony over alimony in solido or in futuro. While this statutory preference does not entirely displace long-term spousal support, alimony in futuro should be awarded only when the court finds that economic rehabilitation is not feasible and long-term support is necessary. *See Bratton*, 136 S.W.3d at 605; *Robertson* [*v. Robertson*], 76 S.W.3d [337,] 341-42 [(Tenn. 2002)].

*Gonsewski*, 350 S.W.3d at 109.

Husband asserts that Wife has a "substantial earning capacity" and that she earned more than Husband at the time of the divorce. However, Husband does not dispute the trial court's findings regarding Wife's income, expenses, and monthly shortfall of $3,035.00. The court clearly credited Wife's testimony concerning her income and expenses, and she presented documentary evidence to support that testimony. We conclude that the evidence does not preponderate against the trial court's finding that Wife's expenses at the time of trial equaled $3,035.00 more monthly than her net income. Thus we discern no error in the trial court's determination that Wife established a need for alimony.

Husband disputes the trial court's findings concerning his ability to pay alimony. At the close of trial, the court directed the parties to prepare "findings of fact on what the parties believe is [Husband's] income." Husband submitted proposed findings relative to his "current income." He cited paycheck stubs that he had presented at trial for his employment with his current employer, Foremost Media, Inc. ("Foremost"), beginning with his hire date on April 1, 2022, and ending on August 27, 2022, approximately one month prior to trial. Extrapolating his monthly gross income from his average earnings with Foremost for these five months, Husband submitted, as he had testified, that his current gross yearly income was $68,000.00, or $5,667.00 per month.

In her proposed findings of fact, Wife submitted a three-year average of what she maintained was Husband's gross business income for the years 2017 to 2019. Citing the parties' joint federal income tax returns for those years, Wife added Husband's business income recorded thereon from Open Click and three other businesses, one recorded as "Online Marketing and Advertising" ("Online Marketing") without a specific business name listed, one named "Beauty," and one named "Robust Spirit LLC" ("Robust Spirit"). Wife averred that certain depreciated expenses should be "add[ed] back" into the income for each business for which Husband had filed an Internal Revenue Service Schedule C

form reflecting business profit or loss ("Schedule C") for at least one of the three years. According to Wife's proposed findings, adopted by the trial court, Husband's business income was as follows for 2017, 2018, and 2019:

Husband's 2017-2019 Gross Business Income Per Wife and Adopted by Trial Court

2017   Husband's gross income from Open Click & Online Marketing:        $ 63,536.00

2018   Husband's gross income from Open Click, Beauty, & Robust Spirit:   177,381.00

2019   Husband's gross income from Open Click & Beauty:                    76,570.00

Three-Year Total:                                                         317,487.00

Three-Year Average:                                                       105,829.00

Wife then calculated Husband's average gross business income for 2017 through 2019 as $105,829.00 and urged the trial court to adopt Husband's average gross income as "at least $105,829 per year," or $8,819.00 monthly.

The trial court "accept[ed] and adopt[ed] [Wife's] proposed findings as to Husband's true income averages since 2017." The court also noted the total amount of deposits that, according to Wife's testimony, Husband had made into one of his Ally bank accounts in the years 2019 ($730,583.00), 2020 ($629,075.00), and 2021 ($858,454.00). In support of her testimony concerning these deposits, Wife presented the Ally bank account records documenting the deposits, and she included these total deposits in her proposed findings of fact as to Husband's income.

On appeal, Husband asserts that "the proof was that Husband had obtained employment and was earning $68,000.00 per year" and that in 2021, he had "earned $77,000.00 for the year . . . ." In support of his statement regarding his 2021 income, Husband cites solely his own trial testimony. Husband did testify that he earned $77,000.00 in 2021, but he further testified that he had not yet submitted his 2021 federal income tax return. Wife also testified that she had not yet filed a 2021 federal income tax return at the time of trial. According to Wife, the parties filed their respective 2020 federal income tax returns as "married, filing separately" in October 2021, several months after their separation. Wife, who presented her 2020 income tax return at trial, testified that she decided to file separately because she "didn't trust the tax returns that [Husband] was about to file." When questioned during the March 2022 contempt hearing regarding whether he had produced any individual federal income tax returns in

discovery, Husband responded: "I submitted my 2020 tax return to my attorney." However, Husband did not present his 2020 individual tax return at trial.

Husband does not directly challenge the trial court's decision to adopt an income averaging method in calculating his income for purposes of alimony and child support. Given that the court's income determination for Husband was also integral to the setting of his child support obligation, we note that the Tennessee Child Support Guidelines provide that "[v]ariable income such as commissions, bonuses, overtime pay, dividends, etc. shall be averaged over a reasonable period of time consistent with the circumstances of the case and added to a parent's fixed salary or wages to determine gross income."[6] Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(b). Here, the trial court found that Husband had been the proprietor of a commission-based business but by the time of trial was no longer earning commissions in his current employment.

The trial court also expressly found Husband not to be credible and found that his earning capacity was far greater than his current salary. The court incorporated its findings from the two contempt hearings into the divorce decree, including the finding that when Husband "shut down his business," it was "a voluntary, willful choice." Husband's income over the last several years prior to the divorce fluctuated, and in determining income for the purposes of child support and alimony, "it is left to the courts to determine on a case-by-case basis the most appropriate way to average fluctuating income." *See Hayes v. Hayes*, No. M2014-00237-COA-R3-CV, 2015 WL 1450998, at *4 (Tenn. Ct. App. Mar. 26, 2015) (quoting *Hanselman v. Hanselman*, No. M1998-00919-COA-Re-CV, 2001 WL 252792, at *3 (Tenn. Ct. App. Mar. 15, 2001)). Considering that Husband did not present a complete picture of his income for 2020 or 2021, we determine that the trial court acted within its discretion by adopting a three-year average of Husband's income from 2017 to 2019. *See, e.g.*, *Buntin v. Buntin*, 673 S.W.3d 593, 607 (Tenn. Ct. App. 2023) (affirming the trial court's averaging of the appellee's "fluctuating income" over a four-year period in determining her need for alimony); *Hayes*, 2015 WL 1450998, at *2 ("[A]verages calculated using durations of a year or more have been consistently upheld by the courts.") (citing multiple examples).

Although Husband does not address the trial court's income-averaging approach in his appellate brief, he does cite the parties' joint federal income tax returns to list gross business income figures for 2017, 2018, and 2019 that differ from the business income figures proposed by Wife. Husband's figures are derived from the "Business income" total from all Schedule C forms that was set forth under "Additional Income and Adjustments to Income" for each year in the tax returns. Husband's claimed "depreciation" costs and expenses had been deducted from those totals. Husband does

---

[6] Husband has not raised an issue regarding his child support obligation.

not directly refute Wife's claim in her proposed findings that certain "depreciation" costs and expenses should be added back into the gross business income totals. The chart below reflects the parties' differing estimates of Husband's gross income for 2017 to 2019:

Comparison of Claimed Gross Business Income, 2017-2019

| | | | |
|---|---|---|---|
| 2017 | Per Husband<br>$ 60,133.00 | Per Wife<br>$ 63,536.00 | Difference<br>$ 3,403.00 |
| 2018 | Per Husband<br>$141,886.00 | Per Wife<br>$177,381.00 | Difference<br>$ 35,495.00 |
| 2019 | Per Husband<br>$ 63,259.00 | Per Wife<br>$ 76,570.00 | Difference<br>$ 13,311.00 |
| Total: | Per Husband<br>$265,278.00 | Per Wife<br>$317,487.00 | Difference<br>$ 52,209.00 |
| Average: | Per Husband<br>$ 88,426.00 | Per Wife<br>$105,829.00 | Difference<br>$ 17,403.00 |

The costs and expenses that Wife added back into Husband's business income were taken from expense sheet attachments to the Schedule C forms in the parties' joint federal tax returns for those years. Primarily, Wife proposed adding back in the costs and expenses that Husband had listed for "phones," "remote office," "website," and "postage." By far the largest amount that Wife proposed adding back in was $32,765.00 listed as expenses on the 2018 Robust Spirit Schedule C. This Schedule C had no accompanying explanation of the expenses as there had been on other Schedule C forms attached to the tax returns.

We emphasize that Husband has not developed an argument, either before the trial court or on appeal, refuting Wife's proposed calculations of his business income for 2017 to 2019 or her proposed method of averaging those incomes. The trial court was not obliged to accept the business income totals listed on the parties' federal income tax returns as the last word on Husband's income. *See Garner v. Garner*, No. E2019-01420-COA-R3-CV, 2020 WL 4354918, at *11 (Tenn. Ct. App. July 29, 2020) ("Tax returns may be useful evidence, but they are not necessarily the final word on a party's income."). Other than simply listing business income totals from the parties' 2017-2019 federal income tax returns, Husband relies solely on his own trial testimony, which the trial court did not find credible. As our Supreme Court has explained:

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, [571] U.S. [894], 134 S. Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). The evidence did not preponderate against the trial court's adoption of Wife's proposed findings concerning Husband's income.

Husband asserts that the trial court awarded alimony while also finding that he did not have the ability to pay spousal support. This is a misrepresentation of the court's findings. The court stated that "Husband's income does not reflect the ability to pay sufficient alimony to make up [Wife's] shortfall" and that "currently Husband is not able to pay what Wife deserves." Husband also maintains that the trial court erred by finding that his income would likely increase after the divorce. The trial court made the transitional alimony award modifiable because it found that Wife's shortfall was greater than Husband's ability to pay and because the court anticipated that Husband's income would increase after the divorce. However, the amount of the $100.00 monthly award was predicated on the parties' financial situation at the time of the divorce. The evidence preponderated in favor of the court's finding that Wife had the need for and Husband had the ability to pay $100.00 in monthly transitional alimony. Moreover, we discern no reversible error in the trial court's analysis of the remaining statutory factors as favoring an award of alimony to Wife.

Given Wife's proven earning capacity, we agree with the trial court's determination that transitional alimony is the appropriate type of periodic spousal support

in this case rather than rehabilitative alimony or alimony *in futuro*. Furthermore, considering the variability of Husband's income, we find no abuse of discretion in the trial court's decision to make the amount of transitional alimony modifiable. *See* Tenn. Code Ann. § 36-5-121(g)(2)(B) (providing that transitional alimony may be rendered modifiable by an order in the initial decree of divorce).

We turn now to the need for a determinate time period for the award of transitional alimony. Tennessee Code Annotated § 36-5-121(g)(1) defines transitional alimony as "a sum of money payable by one (1) party to, or on behalf of, the other party <u>for a determinate period of time</u>" (emphasis added). *See Garner*, 2020 WL 4354918, at *10 (Tenn. Ct. App. July 29, 2020) ("[T]he lack of a determinative period goes against the statute's transitional alimony requirements."). Wife urges that we modify the transitional alimony award to an eight-year time period, relying on this Court's decision in *Lunn v. Lunn*, No. E2014-00865-COA-R3-CV, 2015 WL 4187344, at *10 (Tenn. Ct. App. June 29, 2015). In modifying a trial court's award of "sixteen-plus years of transitional alimony," the *Lunn* Court noted that "[i]n previous cases where the award of transitional alimony was questioned," this Court had "affirmed an award of transitional alimony for a period of eight years <u>at most</u>" (emphasis added). *Lunn*, 2015 WL 4187344, at *10. In *Lunn*, this Court determined that the wife, who had largely contributed to the marriage as a homemaker and was not anticipated to reach the earning capacity of the husband, was in need of alimony *in futuro*. *Id.* at *11. The *Lunn* Court modified the transitional alimony award to alimony *in futuro* and also affirmed the trial court's award of rehabilitative alimony. *Id.*

Here, the trial court found Wife to be well educated, employed, and capable of continuing to earn a good income. Wife had also demonstrated her ability to continue earning her salary while working remotely and acting as the Children's primary residential parent. Considering these facts, we determine five years to be a reasonable time period for Wife to continue receiving transitional alimony. *See id.* at *10. The trial court's award is therefore modified to $100.00 in monthly transitional alimony for a period of five years from the date of the final divorce decree's entry. As the trial court ordered in its final decree, the amount of transitional alimony shall be modifiable up to the end of the five-year determinate period.

## B. Alimony *in Solido*

The trial court granted to Wife two awards of alimony *in solido*, one representing half of what the court found to have been marital assets dissipated by Husband, and one

representing Wife's attorney's fees incurred in prosecuting the divorce.[7]   Regarding alimony *in solido*, our Supreme Court has clarified:

> The second type of support, alimony in solido, is also a form of long-term support.  The total amount of alimony in solido is set on the date of the divorce decree and is either paid in a lump sum payment of cash or property, or paid in installments for a definite term.  Tenn. Code Ann. § 36-5-121(h)(1); *Broadbent* [*v. Broadbent*], 211 S.W.3d [216,] 222 [(Tenn. 2006)] ("Alimony *in solido* consists of a definite sum of money that is paid in a lump sum or in installments over a definite period of time.").  "A typical purpose of such an award would be to adjust the distribution of the parties' marital property."  *Burlew* [*v. Burlew*], 40 S.W.3d [465,] 471 [(Tenn. 2001)].  Alimony in solido "may be awarded in lieu of or in addition to any other alimony award, in order to provide support, including attorney fees, where appropriate."  Tenn. Code Ann. § 36-5-121(d)(5).  Unlike alimony in futuro, the other form of long-term support, alimony in solido is considered a final judgment, "not modifiable, except by agreement of the parties," and does not terminate upon the death or remarriage of the recipient or payor spouse.  Tenn. Code Ann. § 36-5-121(h)(2)-(3); *see Riggs* [*v. Riggs*], 250 S.W.3d [453,] 456 n.3 [(Tenn. Ct. App. 2007)].

*Gonsewski*, 350 S.W.3d at 108 (footnote omitted).  We will address each of the trial court's alimony *in solido* awards in turn.

## 1. Dissipation

Husband contends that the trial court erred in finding that he had dissipated $133,688.00 in marital funds by spending those funds on S.S. and her child.  Accordingly, Husband disputes the award to Wife of half the dissipated funds, or $66,844.00, as alimony *in solido*.  "Dissipation of marital property occurs when one spouse uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time when the marriage is breaking down."  *Altman v. Altman*, 181 S.W.3d 676, 681-82 (Tenn. Ct. App. 2005).  As this Court has explained:

> [T]he allegedly improper or wasteful expenditure or transaction must be considered in the context of the marriage as a whole, and it must be weighed along with all the other relevant factors in the case.  The factors that courts most frequently consider when determining whether a particular

---

[7] The trial court also awarded to Wife attorney's fees she incurred in pursuing two contempt motions against Husband in a total amount of $13,713.50.  Husband has not raised an issue concerning the attorney's fees awarded in relation to Wife's contempt motions.

expenditure or transaction amounts to dissipation include: (1) whether the expenditure benefitted the marriage or was made for a purpose entirely unrelated to the marriage; (2) whether the expenditure or transaction occurred when the parties were experiencing marital difficulties or were contemplating divorce; (3) whether the expenditure was excessive or de minimis; and (4) whether the dissipating party intended to hide, deplete, or divert a marital asset.

*Id.* at 682 (internal citations and footnote omitted). Once a pattern of spending has been established as typical during the marriage, a trial court is not to consider it as dissipation. *See Altman*, 181 S.W.3d at 682 n.5 ("It is unlikely that expenditures that were typical or commonplace during the marriage will constitute dissipation, especially when the other spouse acquiesced in them.").

The trial court found that Wife established a *prima facie* case of Husband's dissipation at trial and that Husband failed to present any countervailing evidence other than his own testimony that the dissipated assets equaled less than the amount claimed by Wife. As this Court has explained:

"[T]he burden of persuasion and the initial burden of production in showing dissipation is on the party making the allegation, and that party retains throughout the burden of persuading the court that funds have been dissipated." *See Burden v. Burden*, 250 S.W.3d 899, 919 (Tenn. Ct. App. 2007) (quoting *Wiltse v. Wiltse*, No. W2002-03132-COA-R3-CV, 2004 WL 1908803, at *4 (Tenn. Ct. App. Aug. 24, 2004)) (internal citations omitted in *Burden*). However, "[o]nce the party alleging dissipation has established a prima facie case of dissipation, the burden shifts to the other spouse to show the court that the expenditures were not dissipation." *Trezevant v. Trezevant*, 568 S.W.3d 595, 618 (Tenn. Ct. App. 2018).

*Gergel v. Gergel*, No. E2020-01534-COA-R3-CV, 2022 WL 1222945, at *15 (Tenn. Ct. App. Apr. 26, 2022).

Wife presented an exhibit at trial that she described as follows:

This is what I took from a pivot table. I imported all of [Husband's] credit cards and bank accounts and put them into an Excel sheet, then categorized everything based on those airline tickets with [S.S.'s] name and her son's name on them, trips that were in California, Virginia, all over the place.

Wife then described types of alleged dissipation expenses she had categorized, including Husband's trips with S.S. and her son, gifts Husband purchased for S.S. before and after the parties' separation, and "[c]ontinuing affair expenses," all either charged to credit cards or drawn on Husband's accounts with Nova Bank and Ally Bank. Wife stated that to obtain the figures regarding Husband's travel with S.S., she examined "[w]hen they were on trips together based on the credit cards and the airline tickets and everything that were on credit cards." Wife explained that the "continuing affair" expenses she calculated were "broken out by different things that [Husband] is paying for while he's in Texas living with her." Wife further explained that she "took all the PDFs of [Husband's] credit card and bank statements and turned them into an Excel document, so these match with his statements that we have, that he submitted to us." Wife presented the documents underlying her summary as an exhibit.

When questioned regarding Wife's exhibit delineating the alleged dissipation, Husband testified that Wife's document "was originally created by [Wife], all my credit card purchases and charges since, I believe, end of 2019 or 2020." He stated that he "went through line by line, every charge she marked as a category, whether it's continuing affair, family expense, gas. . . . and made corrections where I thought they should be, I mean, mostly disregarding the continuing affair expenses." According to Husband, he "came up with $9,734" as the total amount of what he spent on S.S. and her son. Husband reviewed Wife's exhibit at trial without submitting a detailed exhibit of his own, again relying on his testimony regarding the purpose of the expenses.

The trial court found that Wife had "demonstrated a prima facie case for dissipation" and that Husband had failed to "present any countervailing evidence to Wife's proof." We agree. Wife demonstrated that Husband's expenditures at issue (1) were made for a purpose entirely unrelated to and even harmful to the marriage, (2) occurred when the parties were experiencing marital difficulties or contemplating divorce, (3) were excessive, and (4) utilized funds intentionally diverted or depleted by Husband. In support of his argument, Husband relies on his testimony that he reviewed Wife's exhibit and "came up with $9,734" as the total amount of marital funds he dissipated and his testimony that he had incurred $156,000.00 of household debt on his credit cards at the time of separation. Husband did not produce any proof, however, of how the other funds identified by Wife were spent, and he did not produce the line-by-line review he claimed to have made. Husband also failed to demonstrate that he had incurred $156,000.00 in credit card debt for household expenses prior to the parties' separation.

The trial court expressly credited Wife's testimony over Husband's concerning the dissipation, and our reading of the trial transcript supports this credibility finding. The issue of dissipation is "a question that often hinges on the trial court's assessment of the

demeanor and credibility of witnesses at trial . . . ." *Ellis v. Ellis*, No. E2020-00869-COA-R3-CV, 2022 WL 3724768, at \*14 (Tenn. Ct. App. Aug. 29, 2022). Moreover, we will not disturb a trial court's credibility finding absent clear and convincing evidence to the contrary. *See Kelly*, 445 S.W.3d at 692.

In awarding $66,844.00, or half of the dissipated funds, to Wife, the trial court directed Husband to pay $25,000.00 immediately and the remaining balance in $500.00 monthly payments to Wife "with interest running on the balance at the statutory rate." We affirm this award of alimony *in solido* as reasonable and well within the trial court's discretion. *See Broadbent v. Broadbent*, 211 S.W.3d 216, 222 (Tenn. 2006) ("Alimony *in solido* consists of a definite sum of money that is paid in a lump sum or in installments over a definite period of time.").

## 2. Attorney's Fees at Trial

Husband contends that the trial court erred by awarding to Wife $64,387.50 in attorney's fees as alimony *in solido*. In his statement of the issues, Husband also appears to raise an issue concerning the timing of the trial court's order awarding attorney's fees, stating as his fourth issue:

> Did the trial court err in awarding any attorney fees, as alimony *in solido*, to [Wife] while the Bankruptcy Stay was in effect?

However, Husband does not develop an argument in relation to the bankruptcy stay. In the argument section of his brief, Husband's heading for his fourth issue is:

> Did the trial court err in awarding any attorney fees to [Wife] as alimony *in solido*?

Husband does not mention the bankruptcy stay within his argument for this issue. In recounting the procedural history and facts of the case, Husband notes that the trial court entered the attorney's fee order one day after Husband had filed his notice of filing for bankruptcy but Husband does not present any argument or authority stating that entry of such an order while the bankruptcy stay was in effect was improper.

The trial court found that it had the authority to enter the attorney's fee order while the bankruptcy stay was in effect because as alimony *in solido*, the judgment represented a domestic support obligation. The trial court cited 11 U.S.C. § 362(b)(2)(A)(ii), which provides that the filing of a bankruptcy application "does not operate as a stay . . . under subsection(a) . . . for the establishment or modification of an order for domestic support obligations." On appeal, Wife argues in part that this Court "is not the proper forum to

litigate the enforcement of the bankruptcy stay." However, this Court has previously explained that "[w]hile the bankruptcy court has exclusive authority to allow a party relief from the stay, a nonbankruptcy court has jurisdiction to determine whether the stay applies at all." *See BAC Home Loans Servicing, LP v. Taylor*, No. E2012-01985-COA-R3-CV, 2013 WL 3179107 (Tenn. Ct. App. June 20, 2013) (quoting *Ditto v. Del. Sav. Bank*, No. E2006-01439-COA-R3-CV, 2007 WL 471146, at *7 (Tenn. Ct. App. Feb. 14, 2007)).

Wife contends that Husband has waived any dispute regarding the timing of the trial court's order because he failed to develop an argument on the issue. We agree with Wife on this point and deem waived any issue that Husband may have intended to raise concerning the timing of the attorney's fees order while the bankruptcy stay was in effect. *See Regions Fin. Corp. v. Marsh USA, Inc.*, 310 S.W.3d 382, 392 (Tenn. Ct. App. 2009) ("[W]here a party fails to address an issue in its argument section of the brief, we consider the issue to be waived."); *Newcomb*, 222 S.W.3d at 400.[8]

Husband also argues that the trial court erred by finding that Wife demonstrated the need for attorney's fees incurred during the divorce proceedings. Regarding such an award, our Supreme Court has instructed:

> It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. The decision whether to award attorney's fees is within the sound discretion of the trial court. As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses or the spouse would be required to deplete his or her resources in order to pay them. Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony.

*Gonsewski*, 350 S.W.3d at 113 (citations omitted). "When reviewing the trial court's decision to award attorney's fees as alimony *in solido*, we must consider the same factors

---

[8] We note that Tennessee courts have adopted an approach holding that "an action filed in violation of the automatic bankruptcy stay is voidable and not void." *Southland Express, Inc. v. Scrap Metal Buyers of Tampa, Inc.*, 895 S.W.2d 335, 341 (Tenn. Ct. App. 1994) (citing *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir. 1993)).

contained in Tennessee Code Annotated § 36-5-121(i) that we considered when analyzing the transitional alimony award." *Buntin*, 673 S.W.3d at 612.

Following a paragraph of general law concerning attorney's fees awarded in a divorce, Husband's entire argument on this issue consists of the following paragraph:

> In our case, the Wife, was awarded two (2) savings accounts in the division of property. How does a disadvantaged wife, who lacks over $3000.00 per month to meet her monthly expenses, still have the money to accumulate and not use savings accounts. Further, the wife was awarded the parties' residence which if sold would have brought enough money to pay all of the parties' marital debts. In addition, Wife earns over $11,000.00 per month and receives child support. She has sufficient income and assets from which to pay her own attorney fees.

We find Husband's argument unavailing. As Wife points out, a disadvantaged spouse is not required to sell her home and liquidate all available assets to pay reasonable attorney's fees incurred during the pendency of a divorce. We note that the trial court specifically found Wife's attorney's fees to be "reasonable and necessary to obtain the relief requested by [Wife]" and that Husband has not disputed this finding.

This Court's decision in *Buntin* addressed a similar situation wherein the husband argued that the wife had received enough assets in the divorce to make it inequitable to award her attorney's fees. *See Buntin*, 673 S.W.3d at 612. This Court determined that although the wife "did receive significant assets in the divorce, many of those assets were not liquid and were thus unavailable to be utilized to pay [the wife's] fees and living expenses." *Id.* The *Buntin* Court thus concluded that the wife "should not be compelled to spend her limited liquid assets to pay attorney's fees given her significant economic disadvantage and her lack of ability to replace those assets."

In the case at bar, Husband's argument rests in part on his assertion that the trial court should have valued the Marital Residence at a much higher amount and ordered the home sold with the proceeds divided between the parties. Having previously determined that the trial court did not abuse its discretion in its valuation of the Marital Residence and award of the home to Wife, we are also not persuaded by Husband's argument that Wife should have been ordered to sell and vacate the Marital Residence to pay her reasonable attorney's fees. Having also determined that the trial court properly analyzed the statutory factors related to spousal support, we discern no abuse of discretion in the court's award of attorney's fees to Wife.

For the above-stated reasons, we affirm the trial court's awards of spousal support to Wife with one modification to set a determinate time period of five years from the entry date of the final divorce decree for the award of $100.00 monthly in transitional alimony. The awards of alimony *in solido*, inclusive of one-half of the dissipated marital funds and the reasonable attorney's fees incurred by Wife in prosecuting the divorce, are affirmed in their entirety.

## VI. Permanent Parenting Plan

Husband asserts that the trial court erred by adopting Wife's proposed permanent parenting plan because it "unnecessarily restricts [his] parenting time and unreasonably requires that [he] come to Tennessee from Texas for reunification therapy with the children." The crux of Husband's argument is that because the trial court's permanent parenting plan order ("PPP") requires him to attend reunification therapy with the Children in person to facilitate the first phase of the three-phase co-parenting residential schedule, the PPP "all but makes it impossible for [Husband] to regain his right to parent the children." Wife responds that it was not unreasonable for the trial court to require Husband to attend reunification therapy in person because (1) the court credited Wife's testimony that the parties' daughter was "very timid about Husband," (2) Husband had maintained a leased townhome in Chattanooga for a year following the separation, and (3) Husband voluntarily relocated to Texas following the separation. Upon careful review, we determine that the trial court did not abuse its discretion in finding Wife's proposed PPP to be in the best interest of the Children or in finding that it would be in the Children's best interest for Husband to participate in person in reunification therapy.

At the time of a divorce when at least one minor child is involved, as here, the trial court must "make a custody determination" "on the basis of the best interest of the child." *See* Tenn. Code Ann. § 36-6-106(a) (West July 1, 2021, to March 17, 2022). The court is required to apply statutory best interest factors enumerated in Tennessee Code Annotated § 36-6-106(a) to determine a custody arrangement in the best interest of the Child. At the time the instant complaint was filed, the version of Tennessee Code Annotated § 36-6-106(a) applicable to this action provided:[9]

> In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a

---

[9] Throughout this Opinion, all citations to Tennessee Code Annotated § 36-6-106 shall be made in reference to the version that was effective on April 1, 2021, the date the complaint was filed in this action, and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4, n.6 (Tenn. Ct. App. Aug. 5, 2023).

minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1)     The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2)     Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3)     Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4)     The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5)     The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6)     The love, affection, and emotional ties existing between each parent and the child;

(7)     The emotional needs and developmental level of the child;

(8)     The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9)     The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10)    The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11)    Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12)    The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13)    The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14)    Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15)    Any other factors deemed relevant by the court.

The trial court properly conducted a best interest analysis considering the above-listed factors. Upon doing so, the court determined that all of the applicable factors weighed in Wife's favor. Based on our review of the evidence, we determine that the evidence supports the trial court's findings. We reiterate that we review a trial court's determination of an appropriate permanent parenting plan utilizing an abuse of discretion standard. *See Morelock v. Morelock*, No. E2016-00543-COA-R3-CV, 2017 WL 3575890, at *1 (Tenn. Ct. App. Aug. 18, 2017).

The trial court's findings as to factor six (the love, affection, and emotional ties existing between each parent and the Children) speak especially to the requirement for in-person reunification therapy that Husband is challenging. The court stated:

> Husband has not visited with [the] Children since December 28, 2021.

> He rented an apartment in Chattanooga in May or June of 2021. He spent [a] total of one month in the apartment. He did not visit the Children while he was here in Chattanooga. Husband calls [the] Children a few times a week. The daughter is very timid about [Husband] now. This Court entertained Wife's second motion for civil contempt on March 30, 2022. Husband chose not to attend the hearing in person. This was another time he could have visited with the Children in person in Chattanooga, but he elected not to. On the one hand [Husband] says he wants more time with the Children, but on the other hand [Husband] only wants to do virtual counseling with the Children. In person therapy would allow [Husband] to spend more time with the Children.

The court summarized its findings concerning the Children's best interest as follows:

> [Wife] has proposed a parenting plan (PPP) that allows Husband to reestablish a relationship with [the] Children over a period of time. Thus [Wife's] PPP is in three phases. The first phase allows only supervised visitation with a breathalyzer. In determining a custody arrangement that is in the best interests of the Children and maximizes participation of both parents in the lives of the Children in light of the locations of the Parties, the Children's need for stability, and the other statutory factors, the Court adopts [Wife's] proposed parenting plan.

> Husband needs reunification therapy with [the] Children. The Court concludes the therapy should be live in person and not virtual and paid for by [Husband].

Husband insists that the trial court's adoption of Mother's PPP and requirement that he participate in reunification therapy in person "all but make[] it impossible for [Husband] to regain his right to parent the children." We find Husband's argument unpersuasive. Importantly, Husband voluntarily relocated to Texas days after the parties separated to be with his paramour while making no provisions to regularly visit the Children. Husband testified that he is currently employed by a company based in Wisconsin for which he can work remotely. His relocation is not related to his employment. During the year following the separation, Husband paid $2,500.00 per month to lease a townhome in Chattanooga in which he testified he spent "[m]aybe a month" total, bringing the Children there once to visit with the court-approved supervisor on December 28, 2021. Husband asserts that Wife interfered with his co-parenting time during December of 2021, but the weight of testimony at trial does not support this claim.

Testimony demonstrated that Husband was determined to visit with the Children only if such visitation could be unsupervised. Moreover, he made little effort to visit with the Children in person under the court-ordered restrictions of supervised visitation. As Wife points out, the trial court's PPP sets no restrictions on Husband's ability to contact the Children via telephone or virtually; the only restriction in this vein is that Husband must participate in reunification therapy in person with the Children. We conclude that the trial court acted well within its broad discretionary authority to set this restriction and adopt Wife's PPP as in the Children's best interest.

## VII. Attorney's Fees on Appeal

As her sole issue on appeal, Wife asserts that Husband should be ordered to pay her attorney's fees incurred in defending against his appeal. As this Court has explained:

> In divorce proceedings, the recovery of attorney's fees by a litigant is provided for by statute which provides that a spouse seeking enforcement of an alimony or custody award in a decree may be granted attorney's fees in the discretion of the court before whom the action is pending. Tenn. Code. Ann. 36-5-103(c) (2003).
>
> The discretion to award attorney's fees on appeal in a proceeding of this nature rests within the discretion of the Court. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). When considering a request for attorney's fees on appeal, we also consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the requesting party sought the appeal in good faith, and any other equitable factors relevant in a given case.

*Chase*, 670 S.W.3d at 304-05 (quoting *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005)).

In the present case, although Husband was largely unsuccessful on appeal, we do not conclude that he sought the appeal in bad faith. Considering all equitable factors and exercising our discretion, we decline to award attorney's fees on appeal to Wife.

## VIII. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court with one modification to set a determinate time period of five years from the entry date of the final divorce decree for the award to Wife of transitional alimony. We deny Wife's request for attorney's fees on appeal. We remand this case to the trial court for enforcement of the judgment and collection of costs below. Costs on appeal are assessed to the appellant, Tyler C. Jensen.

s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE